NUMBER 13-08-00685-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI -
EDINBURG 


                                                                                                                     


 

JUAN ANTONIO GONZALEZ,                                           
    Appellant,

 

v.

 

THE STATE OF TEXAS,                         
                            Appellee.

                                                                                                                     
  

 

On appeal from the 398th
District Court 

of Hidalgo County,
Texas.

                                                                                                                     


 

MEMORANDUM OPINION

 

Before Chief Justice
Valdez and Justices Rodriguez and Benavides  

Memorandum Opinion by
Justice Rodriguez

                                                                                                                                    

Appellant Juan Antonio Gonzalez
challenges his conviction by a jury for capital murder, for which he was
sentenced to life imprisonment.  See Tex.
Penal Code Ann. § 19.03(a)(2) (West Supp. 2010).  By six issues,
Gonzalez argues that:  (1) the evidence at trial was legally and factually
insufficient to support his conviction; (2) the trial court erred in admitting
as evidence certain firearms found with Gonzalez at the time of his arrest
because the firearms amounted to inadmissible character conformity evidence and
were unfairly prejudicial; (3) the trial court erred in admitting the firearms
because the State failed to give adequate notice of its intent to use the
firearms as extraneous offense or bad acts evidence; (4) the trial court erred
in denying Gonzalez's motion for mistrial after a police officer testified that
Gonzalez had a prior arrest; (5) the trial court denied Gonzalez effective
assistance of counsel and his due process rights when it "effectively
denied" Gonzalez the indigent funds and sufficient time to retain the
services of a firearms expert; and (6) the jury was erroneously instructed in
the law-of-the-parties application paragraph regarding the requisite culpable
mental state for retaliation, the alleged aggravating crime that elevated the
killing from murder to capital murder in this case.  We affirm.

I. 
Background

 

            Gonzalez was indicted as follows for capital
murder:

[O]n or about the
10th of July A.D., 2004, . . . in Hidalgo County, Texas, [Gonzalez] did then
and there intentionally cause the death of an individual, namely, Alfonso Cruz
Leos, by shooting the victim with a firearm and [Gonzalez] was then and there
in the course of committing or attempting to commit the offense of retaliation
against Alfonso Cruz Leos . . . .[[1]]

 

See id.  Gonzalez pleaded not
guilty, and from April 26 to May 9, 2006, the case was tried to a jury.[2] 
After the close of the evidence, the jury convicted Gonzalez of capital murder,
and the trial court sentenced him to life imprisonment in the Institutional Division
of the Texas Department of Criminal Justice.  Gonzalez filed a motion for new
trial, which was denied by the trial court.  This appeal followed.

II. 
Sufficiency of the Evidence

 

            By his first issue, Gonzalez challenges the
legal and factual sufficiency of the evidence supporting his capital murder
conviction.  Specifically, Gonzalez argues that:  (1) the evidence does not
prove either that Gonzalez himself shot, or caused the death of, Alfonzo Cruz Leos
or that his participation or actions contributed to the killing so as to
support a law-of-the-parties finding; and (2) there is no evidence that the
murder was committed as an act of retaliation.

A. 
Standard of Review and Applicable Law

            Gonzalez challenges both the legal and
factual sufficiency of the evidence presented against him.  However, the Texas
Court of Criminal Appeals’s 2010 Brooks v. State opinion abolishes this
distinction.  323 S.W.3d 893, 895 (Tex. Crim. App. 2010).  The court held that
"the Jackson v. Virginia legal sufficiency standard is the only
standard a reviewing court should apply in determining whether the evidence is
sufficient to support each element of a criminal offense that the state is
required to prove beyond a reasonable doubt."  Id.  In light of the
Brooks holding, this Court will only conduct a legal sufficiency review.

            When conducting this sufficiency review, the appellate
court must ask itself "whether, after reviewing the evidence in the light
most favorable to the prosecution, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt" and not
whether it believes the evidence establishes the verdict beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).  "[T]he
jury is the sole judge of a witness’s credibility[] and the weight to be given
the testimony."  Lancon v. State, 253 S.W.3d 699, 707 (Tex. Crim.
App. 2008).  The reviewing court should not act as a thirteenth juror that
substitutes its own opinion of the credibility and weight of the evidence for
that of the fact finder's.  See Brooks, 323 S.W.3d at 905.  Instead, the
reviewing court must "resolve inconsistencies in testimony in favor of the
verdict" and then ask whether a rational trier of fact could have found
the elements of the crime beyond a reasonable doubt.  Curry v. State, 30
S.W.3d 394, 406 (Tex. Crim. App. 2000).  

            To measure legal sufficiency, we use the
elements of the offense as defined by a hypothetically correct jury charge.  Villarreal
v. State, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009).  "Such a charge
is one that accurately sets out the law, is authorized by the indictment, does
not unnecessarily increase the State's burden of proof or unnecessarily
restrict the State's theories of liability, and adequately describes the
particular offense for which the defendant was tried."  Id.  As
indicted in this case, a person commits the offense of capital murder if he
"intentionally commits the murder in the course of committing or
attempting to commit . . . retaliation."  Tex. Penal Code Ann. § 19.03(a)(2).  A person commits murder
if he "intentionally or knowingly causes the death of an individual . . . ." 
Id. § 19.02(b)(1) (West 2003).  A person commits the offense of
retaliation "if he intentionally or knowingly harms or threatens to harm
another by an unlawful act . . . in retaliation for or on account of the service
or status of another as a[n] . . . informant . . . ." 
Id. § 36.06(a)(1)(A) (West Supp. 2010).  A person is guilty as a party
to an offense "if the offense is committed by his own conduct, by the
conduct of another for which he is criminally responsible, or both."  Id.
§ 7.01(a) (West 2003).  A person "is criminally responsible for an offense
committed by the conduct of another if . . . acting with
intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense."  Id. § 7.02(a)(2) (West 2003).

It is not necessary that the evidence
directly proves the defendant’s guilt; "[c]ircumstantial evidence is as
probative as direct evidence in establishing the guilt of the actor, and
circumstantial evidence alone can be sufficient to establish guilt."  Hooper
v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); see Kuciemba v. State,
310 S.W.3d 460, 462 (Tex. Crim. App. 2010).  "Circumstantial evidence
alone may [also] be used to prove that a person is a party to an
offense."  Powell v. State, 194 S.W.3d 503, 506 (Tex. Crim. App.
2006) (citations omitted); Escobar v. State, 28 S.W.3d 767, 774 (Tex.
App.—Corpus Christi 2000, pet. ref'd).  A fact finder may support its verdict
with reasonable inferences drawn from the evidence, and it is up to the fact
finder to decide which inference is most reasonable.  Laster v. State,
275 S.W.3d 512, 523 (Tex. Crim. App. 2009).  

B. 
The Evidence

            At trial, the evidence established that
between 7:00 and 8:00 a.m. on July 10, 2004, Leos was shot while he was mowing
the front yard at his home on Charro Street in North Mission, Texas.  Leos died
later that morning at McAllen Hospital from multiple gunshot wounds.  The State
presented the following testimony about the events of that morning and the
investigation that followed.

            Erica Lucero was Leos's wife.  She testified
that Leos was a law enforcement informant.  Because he was an informant, Leos
had suffered multiple attempts on his life.  For this reason, Lucero testified
that she and Leos had fortified their home:  they strung barbed wire around
their yard, installed a steel plate in their front door, and put in
bullet-proof windows in their bedroom.  Lucero testified that Leos always
carried a gun on his waist.  

On the morning of July 10, 2004, Lucero
heard gunshots while Leos was outside mowing the yard.  She looked out the
window and saw a maroon Grand Prix with two to three persons inside it; shots
were being fired from the Grand Prix.  Lucero then picked up what she described
as an "AK-47" from their bedroom, went outside, and began shooting at
the car.  She could not say whether she hit the car or anyone in it.  After the
car drove away, she found Leos on the ground; he had been shot.  Lucero took
Leos to the hospital, but he died before surgery.

            Lucero believed that either Raul Montoya, who
had allegedly tried to kill Leos in January 2004, or Carlos Milton, also known
as La Bota, were responsible for killing Leos.  Lucero testified that Leos and
La Bota were friends from the same town in Mexico.  The week before Leos was
killed, Leos gave the police information about La Bota.  La Bota was arrested
two days before the shooting.  Lucero believed that La Bota knew that Leos had
informed on him.

            Fulgencio Salinas, M.D. was the forensic
pathologist who performed the autopsy on Leos.  Dr. Salinas testified that Leos
received multiple gunshot wounds and died as a result of those wounds.  The
wounds were "distant" type gunshot wounds, which means that the shots
were fired from more than three feet away.  Dr. Salinas testified that the
nature and characteristics of Leos's wounds were consistent with shots fired
from a high-caliber weapon.

            Richard Hitchcox, the State's firearms
expert, testified about the weapons recovered during the investigation of the
case.  Hitchcox testified that two 7.62 by 39 millimeter caliber semiautomatic
rifles were recovered:  one was recovered from a "storage area
underground" and the other from Leos and Lucero's car.  One .380 caliber
semi-automatic handgun was recovered from Leos and Lucero's car, as well; the
evidence showed that Leos was carrying this handgun at the time of his
shooting.  Hitchcox testified that two of the weapons recovered from the motel
where Gonzalez was arrested were a .380 caliber semi-automatic pistol and a 9
millimeter caliber "Smith and Wesson" pistol.[3] 


Hitchcox also testified about the
bullets recovered from Leos's body and the bullet casings recovered at the
scene.  The bullets recovered from Leos's body were fired from a rifle;
Hitchcox could neither confirm nor deny that the bullets were fired from any of
the rifles recovered during the investigation.  Twenty-two casings were
recovered from the scene of the shooting:  thirteen 7.62 caliber casings; five
.380 caliber casings; and four 7.62 by 39 caliber casings.  Hitchcox testified
that none of the 7.62 by 39 caliber casings cycled through the rifle recovered
from the underground storage; he could neither confirm nor deny that those
casings cycled through the rifle found in Leos and Lucero's car.  Hitchcox was
able to match the .380 caliber casings to Leos's semi-automatic pistol. 
Hitchcox testified that he was unable to determine how many firearms were used
at the scene and that, in a majority of cases, he is unable to identify the
firearm used in the crime.

Jose Jaime Rodriguez, an investigator
with the major crimes division of the Hidalgo County Sheriff's Office,
testified regarding the investigation of Leos's killing.  Investigator
Rodriguez testified that Leos was a paid informant and that the information
Leos provided to law enforcement was valuable.  At least three attempts had
been made on Leos's life for being an informant.  Leos provided Investigator
Rodriguez with information regarding, in particular, "pseudo-cops"
and narcotics trafficking and dealing.  Investigator Rodriguez testified that pseudo-cops
are people who dress up like police officers and burglarize homes under that
pretense.  Investigator Rodriguez testified that La Bota ran a ring of drug
dealers and pseudo-cop home invaders.  After his investigation, Investigator
Rodriguez concluded that La Bota's organization retaliated against Leos for
providing information that led to La Bota's arrest.

A couple days before his killing, Leos
had provided Investigator Rodriguez information about La Bota's criminal
operations; La Bota was arrested as a result on July 8, 2004, two days before
the shooting of Leos.  Investigator Rodriguez began his investigation by
questioning Jessie Villarreal, who was known to be part of La Bota's
organization.  Villarreal led Investigator Rodriguez to Jorge Rocha.  On July
12, 2004, Investigator Rodriguez went to Rocha's home and obtained statements
from both Rocha and Rocha's wife, Paula Frias.  The information obtained from
Rocha and Frias led Investigator Rodriguez to Juan Carlos Vasquez, also known
as Miran, and "a subject known as Juan Cancos."  "Juan
Cancos" was eventually identified as Gonzalez.

An anonymous tip then led Investigator
Rodriguez to Francisco Navarro, a crack cocaine dealer in the area; Navarro was
reportedly scared and had buried a gun in his yard.  Investigator Rodriguez
recovered an assault rifle that was buried in Navarro's backyard and a handgun
from Navarro's car.  At that point, the case turned cold for approximately two
months.  Investigator Rodriguez believed that Miran and Gonzalez were "on
the run."

On September 13, 2004, Investigator
Rodriguez received a tip that Miran was living in a house in McAllen, Texas. 
Investigator Rodriguez set up surveillance at that house.  Two men were
observed leaving the house, and Investigator Rodriguez tried to stop them but
they fled.  After a two-hour car and foot chase, Miran was eventually arrested
after he was found hiding in a car at his sister's house.  Miran was holding a
handgun at the time of his arrest.

Investigator Rodriguez soon received
another tip that Gonzalez was at a motel in McAllen and that he had a blue
vehicle.  Investigator Rodriguez again set up surveillance and observed a blue
vehicle drive up to the motel; two persons exited the vehicle and went into the
motel.  Those persons were Gonzalez and Raul Alba.  Alba eventually came out of
the motel, at which point Investigator Rodriguez detained him and Alba stated
that "he didn't want no problems."  Alba told him where to find
Gonzalez.  Investigator Rodriguez went to that room, talked Gonzalez out, and
arrested him.  Investigator Rodriguez testified that he found two weapons in that
room.[4] 


            Alba testified that he first met Gonzalez at
La Bota's house.  He had previously seen Gonzalez and Miran there together;
both worked for La Bota.  Alba also testified that Leos and La Bota were
friends.  

After the killing of Leos, Alba
testified that he saw Gonzalez at a motel.  While they were at the motel,
Gonzalez told Alba that "he and Miran" had killed Leos because Leos
was an informant and they were losing drug sales because of him.  Gonzalez told
Alba that Leos was mowing his lawn "when they killed him."  Alba
testified that he later saw Gonzalez when a friend wanted to "score some
drugs."  They all went to a motel in McAllen and "part[ied]" all
night, doing cocaine and smoking marihuana.  As also described by Investigator
Rodriguez, the police eventually came to the motel, and Alba was arrested and
made a statement to the police.  Alba testified that he had warrants out for
his arrest regarding his aggravated assault probation, but testified that the
State did not promise him anything for his testimony.  

            On cross-examination, Alba testified that he
used cocaine while he was on probation but that his probation was never
revoked.  He also testified that he was high on crack cocaine when he gave his
statement to the police.  In his statement, Alba did not tell the police about
Gonzalez's statement to him that they killed Leos because Leos was an
informant.  Alba testified he first told the State that Gonzalez had made those
statements when he met with the prosecutor "a few months ago."  Alba
stated that when he talked to the prosecutor, he was afraid he was going to go
to jail and "that's the reason [he] told [them] what [they] wanted to
hear."  However, Alba then testified that he "told the truth"
and the prosecutor never told him what to say.

            Frias, Rocha's wife, testified that on the
morning of July 10, 2004, around 8:15 a.m., she heard loud knocking on the
doors and windows of their house.  Miran, Gonzalez, and another man she did not
recognize came in the back door of the house.  They had a gun.  Frias testified
that they appeared "messed up," "panicked," and "just
looked scary."  Miran was bleeding from his shoulder.  Rocha awoke and led
the three men to the living room.  Frias stayed in the hallway and eavesdropped
because she wanted to know what was happening.  Frias heard Gonzalez say,
"Lla lo quebramos," which was translated to mean, "We have
already broken him."  Frias explained that "Lla lo quebramos"
means "a lot of things" but, to her, it means "to kill." 
Frias testified that the three men eventually left in a black Grand Prix.

            When the police came to take Frias's
statement on July 12, 2004, Frias testified that she "was nervous,
rowdy," was "screaming" because she "was scared," and
that the police handcuffed her.  Frias acknowledged that her trial testimony
was the first time she mentioned a gun.  In her statement to the police, Frias
did not mention that Miran, Gonzalez, or the unknown man had a gun when they
came to her house that morning.  Frias also acknowledged that, in her statement
to police, she said that she only recognized Miran that morning and that it was
Miran who made the "Lla lo quebramos" comment.  However, Frias then
stated that she did not initially tell the police about the gun because she was
afraid of her husband, Rocha.  At the time of trial, Rocha was in prison for
capital murder; he did not want Frias to testify.  Frias testified that La Bota
and Rocha were friends and that La Bota was in jail on July 10, 2004.

 

C. 
Gonzalez as the Primary Actor or Party Participant

            Gonzalez contends that the evidence was
insufficient because:  Lucero, the only eyewitness to the shooting, could not
identify which person in the Grand Prix was shooting; the witnesses who
testified most directly as to Gonzalez's involvement—Alba and Frias—were
unreliable, biased, and offered contradictory testimony; and there was no
physical evidence linking Gonzalez to the murder.  As a result, Gonzalez argues
that the evidence was insufficient to show he was the shooter—i.e., the primary
actor in killing Leos—or that he aided and abetted the killing of Leos and was
thus guilty under the law of the parties.  We disagree.  The evidence was
sufficient to prove either theory of capital murder.

            First, Lucero's inability to identify the
person or persons shooting from the Grand Prix on that morning was not fatal to
the State's case.  See Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim.
App. 1986) (en banc) ("Evidence as to the identity of the perpetrator of
an offense can be proved by direct or circumstantial evidence."); see
also Perry v. State, No. 14-09-00937-CR, 2010 WL 5132569, at *3 (Tex.
App.—Houston [14th Dist.] Dec. 14, 2010, no pet.) ("'[P]ositive'
eye-witness testimony is not necessary to determine appellant's
identity.").  There was ample circumstantial evidence from which the jury
could infer either that Gonzalez was the actual shooter or, at the least,
participated as a party.  See Roberson v. State, 16 S.W.3d 156, 167
(Tex. App.—Austin 2000, pet. ref'd) (“[I]dentity may be proven by
inferences.”).  The testimony established that Gonzalez and Miran worked for La
Bota, a known pseudo-cop ring leader and drug dealer who had been arrested two
days before the shooting based on information from Leos.  See Massey v.
State, 826 S.W.2d 655, 658 (Tex. App.—Waco 1992, no pet.) (citing Rodriguez
v. State, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972)) ("[E]vidence of
a motive is the type of evidence that may be used to prove that an accused
committed an offense, because it is relevant as a circumstance tending to prove
the commission of the offense.").  Lucera testified that when she heard
gunshots on the morning of July 10, 2004, she exited her and Leos's house, saw
two to three men firing guns from a dark-colored Grand Prix, and discovered
Leos shot in the front yard.  Dr. Salinas, the medical examiner who performed
Leos's autopsy, testified that the nature of Leos's gunshot wounds showed that
the gun that shot him was fired from a distance of greater than three feet
away, from which the jury could infer Leos's gunshot wounds resulted from the
shots fired from the Grand Prix.  Shortly after Leos was shot, Gonzalez, Miran,
and an unidentified man appeared at Rocha and Frias's house in an agitated
state and carrying a gun.  Miran was bleeding from his shoulder, and based on
Lucera's testimony that she fired her AK-47 at the car, the jury could have
inferred that Miran was hit by Lucera's shots.  According to Frias, Gonzalez
made a statement in Spanish that can be translated, at its worst, as "to
kill" or, in the least, as "we have already broken him."  Frias
testified that Gonzalez, Miran, and the unidentified man drove away from her
house in a dark-colored Grand Prix.  Investigator Rodriguez testified that he
believed Miran and Gonzalez were "on the run," which is a further
circumstance of guilt.  See Clayton v. State, 235 S.W.3d 772, 780 (Tex.
Crim. App. 2007) (recognizing that "a fact finder may draw an inference of
guilt from the circumstance of flight") (citations omitted).  Finally,
Alba testified that Gonzalez admitted to killing Leos because Leos was hurting
their drug dealing business.  From the foregoing circumstantial evidence, the
jury could have rationally determined either that Gonzalez intentionally caused
the death of Leos himself or encouraged and aided in the killing by Miran or
the third unidentified man.  See Tex.
Penal Code Ann. §§ 7.02(a)(2), 19.02(b)(1), 19.03(a)(2); see also
Powell, 194 S.W.3d at 506.

            Second, although it is true that the
testimonies of both Frias and Alba posed potential issues of bias, credibility,
and consistency, it is not the job of this Court to resolve those issues.  See
Brooks, 323 S.W.3d at 905.  Gonzalez points out that Alba admitted to using
cocaine even though he was on probation; did not have his probation revoked
despite this, implying that the State did not act to revoke in exchange for
Alba's testimony and cooperation; was high on crack cocaine when he gave his
statement to police; and testified to facts at trial that he did not include in
his original statement to police.  Gonzalez also contends that Frias was
nervous and "rowdy" when she gave her initial statement to the
police; was handcuffed by police at that point, implying that Frias had
motivation to cooperate with the State; and testified to facts at trial that
she did not include in her statement to police.  However, the jury is the
ultimate judge of credibility and weight to be given to testimony, and it was
free to credit the testimony by Alba and Frias that was favorable to the guilty
verdict.  See Lancon, 253 S.W.3d at 707.  We will not disturb that
determination on appeal.  See Curry, 30 S.W.3d at 394 (directing the
reviewing court to resolve any inconsistencies in the testimony in favor of the
verdict).

            Finally, physical evidence of Gonzalez's
involvement was not necessary.  We acknowledge that the ballistic and other
firearms-related evidence admitted through Hitchcox's testimony was largely
inconclusive.  But Hitchcox also testified that he rarely is able to identify a
murderer from such firearms determinations.  And here, as discussed previously,
the ample circumstantial evidence connecting Gonzalez to Leos's killing was
sufficient.  See Kuciemba, 310 S.W.3d at 462; Hooper, 214 S.W.3d
at 13.  So, we cannot conclude the jury was irrational in crediting this
circumstantial evidence to convict Gonzalez of capital murder.  See Jackson,
443 U.S. at 318-19; Curry, 30 S.W.3d at 406.

D. 
Evidence of Retaliation

            Gonzalez further challenges the evidence of
retaliation.  Again, we conclude that the evidence was sufficient to support
the jury's verdict in this regard.  There was evidence that Leos was an
informant who had had multiple attempts made on his life because of that fact;
as a result, Leos and Lucero's home was heavily fortified.  The testimony
established that, two days before his shooting, Leos had provided the police
with information on La Bota.  La Bota ran a ring of pseudo-cop home invaders
and drug dealers.  The testimony established that Gonzalez was affiliated with
La Bota's gang.  After the shooting, Gonzalez went to the home of Rocha, who
the evidence showed was also an associate of La Bota's.  Like other associates
of La Bota, Gonzalez was arrested in possession of multiple firearms. 
Crucially, Gonzalez admitted to Alba that he and Miran had killed Leos because
Leos was hurting their drug business.  Moreover, both Lucero and Investigator
Rodriguez believed that Leos was killed in retaliation for providing
information on La Bota.  In sum, the foregoing evidence shows La Bota's motive
to retaliate against the informant Leos, connects Gonzalez to La Bota's gang
and reveals Gonzalez's motivation to harm Leos, and, as such, provides a
sufficient basis from which the jury could determine that Leos was murdered by
Gonzalez because of his status as an informant.  See Tex. Penal Code Ann. § 36.06(a)(1)(A).

E. 
Summary

            Having reviewed all the evidence presented at
trial in the light most favorable to the verdict, we conclude the evidence was
such that a rational jury could have concluded:  either that Gonzalez caused
the death of Leos or, through his encouragement and aid, was criminally
responsible for the killing of Leos; and that the murder was committed in
retaliation for Leos's providing information to law enforcement about La Bota's
criminal organization.  See id. §§ 7.01(a), 7.02(a)(2), 19.03(a)(2),
36.06(a)(1)(A); see also Jackson, 443 U.S. at 318-19.  The
evidence was therefore sufficient.  Gonzalez's first issue is overruled.

III. 
Admission of the Firearms

 

            By his second and third issues, Gonzalez
challenges the trial court's admission of the firearms found with Gonzalez when
he was arrested.  

A.  Character
Conformity and Probative Value v. Potential for Prejudice—

Rules 404(b) and 403

 

            In his second issue, Gonzalez argues that the
trial court's admission of the firearms violated rule 404(b)'s prohibition
against character-conformity evidence.  Gonzalez also argues that the firearms'
probative value was outweighed by their unfair prejudice to him, in violation
of rule 403.

1.  Standard of Review

Whether extraneous offense evidence has
relevance apart from character conformity is a question for the trial court and
so, too, is a ruling on the balance between probative value and prejudicial
effect, although that balance is always slanted toward admission of otherwise
relevant evidence.  De La Paz v. State, 279 S.W.3d 336, 343 (Tex. Crim.
App. 2009); Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). 
Thus, we review the trial court's decision on the admissibility of such evidence
for an abuse of discretion.  Casey v. State, 215 S.W.3d 870, 879 (Tex.
Crim. App. 2007).  Under an abuse of discretion standard, we will uphold the
decision of the trial court unless the ruling rests outside the zone of
reasonable disagreement.  Id.  

2.  Applicable Law

Under rule 404(b), evidence of other
crimes, wrongs, or acts is not admissible to prove a person's character and/or
to show that the person acted in conformity with that character.  See Tex. R. Evid. 404(b).  However, such
evidence may be admitted if it is relevant to motive, identity, intent,
opportunity, preparation, plan or absence of mistake. Id.  Moreover, as
the Texas Court of Criminal Appeals has explained, "It has long been the
rule in this State that the jury is entitled to know all relevant surrounding
facts and circumstances of the charged offense; an offense is not tried in a
vacuum."  Moreno v. State, 721 S.W.2d 295, 301 (Tex. Crim. App.
1986) (en banc) (citing Archer v. State, 607 S.W.2d 539, 542 (Tex. Crim.
App. 1980)).    

To constitute an extraneous offense, the
evidence must show a crime or bad act and that the defendant was connected to
it.  Lockhart v. State, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992) (en
banc); Arthur v. State, 11 S.W.3d 386, 390 (Tex. App.—Houston [14th
Dist.] 2000, pet. ref'd).  This "necessarily involve[s]" some sort of
"prior criminal conduct" by the defendant.  Harris v. State,
738 S.W.2d 207, 224 (Tex. Crim. App. 1986) (en banc) (op. on reh'g).  If the
evidence fails to show that an offense was committed or that the accused was
connected to the offense, then it is not evidence of an unadjudicated
extraneous offense.  Id.; Yancey v. State, 850 S.W.2d 642, 644
(Tex. App.—Corpus Christi 1993, no pet.).

But even if the evidence does not invoke
the extraneous misconduct prohibition of rule 404(b), the opponent of the
evidence may further object under rule 403.  Casey, 215 S.W.3d at 879
(citing Santellan v. State, 939 S.W.2d 155, 169-70 (Tex. Crim. App. 1997)
(en banc)); see Tex. R. Evid.
403.  Under rule 403, relevant evidence "may be excluded if its probative
value is substantially outweighed by the danger of unfair prejudice . . .
."  Tex. R. Evid. 403. 
"Probative value" means "the inherent probative force of an item
of evidence—that is, how strongly it serves to make more or less probable the
existence of a fact of consequence to the litigation—coupled with the
proponent's need for that item of evidence."  Casey, 215 S.W.3d at
879 (citing Gigliobianco v. State, 210 S.W.3d 637, 641 (Tex. Crim. App.
2006)).  "Unfair prejudice" means a tendency to suggest decision on
an improper basis.  Id. (citations omitted).  "Evidence might be
unfairly prejudicial if, for example, it arouses the jury's hostility or
sympathy for one side without regard to the logical probative force of the
evidence."  Id. at 880 (citations omitted).

3.  Analysis

            At trial, the State admitted into evidence
eight firearms that were found during the course of the police's
investigation.  As discussed previously, three of those firearms were found in
the motel room where Gonzalez was arrested.  It is undisputed that none of
those firearms were connected to the scene of the shooting.  Gonzalez argues
that the firearms were inadmissible 404(b) extraneous misconduct evidence—we
disagree.  First, mere possession of a gun "is not, in and of itself, a
criminal offense or a bad act."  Robinson v. State, 236 S.W.3d 260,
270 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).  Thus, we do not believe
that the fact that Gonzalez was arrested in the presence of various firearms
necessarily amounts to extraneous offense evidence.  See Lockhart, 847
S.W.2d at 573; Harris, 738 S.W.2d at 224.

            Regardless, the firearms were relevant to
Gonzalez's motive and intent and constituted a relevant circumstance of his
arrest—the firearms were circumstantial evidence of Gonzalez's connection to La
Bota's organization and were thus relevant to his motive and intent to commit
retaliation.  Gonzalez's possession of the firearms linked him to La Bota's
gang of pseudo-cops and drug dealers; in particular, the testimony at trial
established that other affiliates of La Bota's gang who were arrested in the
course of the investigation of Leos's murder also possessed firearms at the
time of their arrests.  Moreover, the circumstances of Gonzalez's arrest—a
motel room where Gonzalez was supplying drugs to others and from which the
State's witness Alba exited and informed law enforcement that he "didn't
want no problems," both of which facts implicate Gonzalez's connection to
La Bota and the inherent suspicion of the situation­ in the motel room—render
the firearms admissible extraneous conduct evidence.  Therefore, even if we assume
that the firearms were extraneous misconduct evidence, they were admissible
under 404(b)'s motive and intent exception to the general prohibition and as
surrounding facts and circumstances of the charged offense.  See Tex. R. Evid. 404(b); see also Moreno,
721 S.W.2d at 301.  

 

            Gonzalez further argues that, even if
admissible under rule 404(b), the prejudicial effect of the firearms evidence
outweighed its probative value at trial.  See Tex. R. Evid. 403.  As discussed above, the evidence was
probative of Gonzalez's connection to La Bota's gang and, therefore, to the
State's efforts to prove that Leos was murdered in retaliation for informing on
La Bota.  See Casey, 215 S.W.3d at 879; see also Tex. R. Evid. 401 ("'Relevant
evidence' means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.").  We conclude, therefore,
that the evidence was relevant.  Arguably, the prejudicial effect was the
potential impression the guns created in the minds of the jury of an armed man
on the run from the law.  See Alexander v. State, 88 S.W.3d 772,
779 (Tex. App.—Corpus Christi 2002, pet. ref'd) (holding that the admission of
a .357 magnum revolver found with the defendant at the time of his arrest had a
substantial and injurious effect on the jury where the only other evidence of
the defendant's identity as the killer was the questionable testimony of the
eye-witness); see also Tex. R.
Evid. 403.  Assuming without deciding that the admission of the firearms
did unfairly prejudice Gonzalez, we would still conclude that the error had but
a slight effect on the jury.  

            Error in the admission of prejudicial
evidence is not one of constitutional dimensions; therefore, we disregard the
error unless it affected Gonzalez's substantial rights.  See Tex. R. App. P. 44.2(b); see also
Alexander, 88 S.W.3d at 779.  A substantial right is affected when the
error had a substantial and injurious effect or influence in determining the
jury's verdict.  King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App.
1997) (citations omitted).  A criminal conviction should not be overturned for
non-constitutional error if the appellate court, after examining the record as
a whole, has fair assurance that the error did not influence the jury, or had
but a slight effect.  Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim.
App. 1998).

            Here, as discussed above, there was ample evidence
of Gonzalez's guilt.  The testimony at trial circumstantially placed Gonzalez
at the scene of the shooting.  He appeared at Frias's house shortly after the
shooting with Miran and a third man in an agitated state and carrying a gun and
made an incriminating statement in Spanish that could be translated as "we
killed him" or "we have already broken him."  He admitted to
Alba that he and Miran killed Leos because Leos was hurting their drug sales. 
Multiple witnesses testified regarding Gonzalez's connection to La Bota's gang
of pseudo-cops and drug dealers.  Finally, in our review of the record, it
appears that the State spent relatively little time on the firearms found with
Gonzalez during the presentation of its case and mentioned those firearms only
briefly in its closing argument.  We therefore conclude that the admission of
the firearms, if erroneous, had but a slight effect on the jury's verdict.  See
id.; see also Tex. R. App. P.
44.2(b).  Gonzalez's second issue is overruled.

B. 
Inclusion of Firearms in State's Pre-trial Notice

            By his third issue, Gonzalez argues that the
trial court erred in admitting the firearms found at the time of Gonzalez's
arrest because the State's notice of intent to introduce extraneous offenses
did not include the firearms.  "[U]pon timely request by the accused in a
criminal case," the State must give "reasonable notice . . . in
advance of trial of [its] intent to introduce" extraneous misconduct
evidence.  Tex. R. Evid. 404(b); see
Hernandez v. State, 176 S.W.3d 821, 822 (Tex. Crim. App. 2005).  Because no
constitutional error is involved when evidence of uncharged misconduct is
admitted without notice, we must disregard any error that did not affect
Gonzalez's substantial rights.  See Tex.
R. App. P. 44.2(b); McDonald v. State, 179 S.W.3d 571, 578 (Tex.
Crim. App. 2005).  In the context of the State's failure to give notice of its
intent to introduce extraneous misconduct evidence, the harm will flow from the
surprise to the defendant and the inability to prepare his defense in light of
that evidence.  See Hernandez, 176 S.W.3d at 825–26; see also Hayden
v. State, 66 S.W.3d 269, 272 & n.16 (Tex. Crim. App. 2001) ("[T]he
purpose of Rule 404(b) notice is to prevent surprise" and "to allow a
defendant adequately to prepare to defend against the extraneous offense
evidence."). 

Here, as noted previously, we do not
believe that mere possession of a firearm is, in and of itself, extraneous
misconduct, so we question whether the State's introduction of the firearms
even invokes rule 404(b).  See Robinson, 236 S.W.3d at 270; see
also Lockhart, 847 S.W.2d at 573; Harris, 738 S.W.2d at 224.  What's
more, Gonzalez makes no assertion or argument that he was "surprised"
or otherwise harmed by the State's failure to include the firearms in its rule
404(b) notice.  See Tex. R. App.
P. 38.1(i).  Neither does Gonzalez state or explain how his defense
strategy would have been different had the State notified him of its intent to
offer the firearms.  See id.; see also Hernandez, 176 S.W.3d at
826.  Even if Gonzalez had made these arguments, however, we find no indication
of any surprise in the record before us.  This was Gonzalez's second trial of
the matter, and at the first trial, the State introduced the same firearms
about which he now complains in this issue.  Accordingly, as reasoned by the
court of criminal appeals in Hernandez, it "strains credulity"
for Gonzalez to contend that he had no notice that the State would introduce
the firearms at the second trial or that, after being faced with the same
firearms evidence six months earlier in the first trial, he had inadequate time
or ability to prepare his second-trial defense to consider those firearms.  See
176 S.W.3d at 826 (holding that the defendant was on notice of the State's intent
to introduce the audiotapes of his statements to police where the defendant had
been furnished a copy of the tapes before trial and the highly relevant nature
of the tapes virtually ensured the State would attempt to use them at trial). 
Therefore, the error, if any, by the trial court in admitting the firearms
without pretrial rule 404(b) notice did not affect Gonzalez's substantial
rights so there was no harm.  See Tex.
R. App. P. 44.2(b).  We overrule Gonzalez's third issue.

IV. 
Motion for Mistrial

 

            By his fourth issue, Gonzalez argues that the
trial court erred in denying his motion for mistrial after Investigator
Rodriguez mentioned in his trial testimony that Gonzalez had a prior arrest. 
The complained-of testimony and subsequent objection and exchange arose in the
context of Investigator Rodriguez describing his surveillance of the motel
where Gonzalez was arrested with Alba:

[Prosecutor]:              So
you said they [Gonzalez and Alba] arrived in a blue vehicle?

 

[Rodriguez]:              Yes.

 

[Prosecutor]:              Did
they park the vehicle there at the Dell Inn?

 

[Rodriguez]:              Yes.

 

[Prosecutor]:              And
who were those two – were you able to identify who those persons were?

 

[Rodriguez]:              I
recognized Cancos [Gonzalez].

 

[Prosecutor]:              Okay. 
And how is it that you recognized him?

 

[Rodriguez]:              From
photos we had received from prior arrests that he had –

 

            [Defense
counsel]:              I'm going to object, Your Honor.

 

            [The
Court]:                           Sustained.

 

[Defense
counsel]:              I'm going to ask the jury be instructed to disregard
that remark.

 

[The
Court]:                           The jury will be instructed to disregard that
remark.

 

[Defense
counsel]:              We appreciate the Court's ruling, feel error has
attached and would ask for a mistrial.

 

            [The
Court]:                           Motion for mistrial is denied.

 

After the trial court instructed the jury to disregard
Investigator Rodriguez's remark, the jury was asked to leave the courtroom, and
counsel for the State and Gonzalez conferred with the court.  At this point,
the prosecutor informed the trial court that Investigator Rodriguez's remark
caught her off guard because she had expressly admonished him not to mention
Gonzalez's prior arrests during his testimony.  Counsel for Gonzalez reiterated
his position that the jury was irreparably harmed by the mention.  The trial
court then repeated its denial of Gonzalez's motion for mistrial.

"An appellate court reviewing a
trial court's ruling on a motion for mistrial must utilize an abuse of
discretion standard of review."  Wead v. State, 129 S.W.3d 126, 129
(Tex. Crim. App. 2004) (citations omitted).  This standard requires that we
view the evidence in the light most favorable to the trial court's ruling,
consider only those arguments before the court at the time of the ruling, and
uphold the court's ruling if it falls within the zone of reasonable
disagreement.  Id. (citations omitted).  

A mistrial is required only when the
evidence is "so clearly calculated to inflame the minds of the jury or is
of such damning character as to suggest it would be impossible to remove the
harmful impression from the jury's mind."  Kemp v. State, 846
S.W.2d 289, 308 (Tex. Crim. App. 1992) (en banc) (citations omitted); see
Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).  In other
words, it is an "appropriate remedy in 'extreme circumstances' for a
narrow class of highly prejudicial and incurable errors."  Ocon v.
State, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (citing Hawkins v.
State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc); Wood v. State,
18 S.W.3d 642, 648 (Tex. Crim. App. 2000)).  Typically, an instruction by the
trial judge to disregard will suffice to cure an inadmissible reference to or
implying of extraneous offenses.  See Kemp, 846 S.W.2d at 308.  This is
because we generally presume that the jury follows the trial court's
instructions.  See Thrift v. State, 176 S.W.3d 221, 224 (Tex. Crim. App.
2005); see also Waldo v. State, 746 S.W.2d 750, 753 (Tex. Crim.
App. 1988) (en banc) (holding that the jury presumed to follow the trial
court's instruction to disregard evidence).  To rebut this presumption,
Gonzalez must point to evidence that the jury failed to follow the trial
court's instruction to disregard Investigator Rodriguez's remark.  See
Thrift, 176 S.W.3d at 224 (citing Colburn v. State, 966 S.W.2d 511,
520 (Tex. Crim. App. 1998)).

 

In this case, we cannot conclude that
the singular, unembellished mention of Gonzalez's "prior arrests"
amounted to the sort of clearly inflammatory evidence or extreme circumstance
that would warrant a mistrial.  See Kemp, 846 S.W.2d at 308; see also
Ocon, 284 S.W.3d at 884.  Investigator Rodriguez's comment was uninvited by
the prosecutor's questioning, and the prosecutor, herself, was surprised by the
improper remark.  Moreover, Gonzalez has pointed to no evidence in the record,
and we find none, that the jury did not follow the trial court's prompt
instruction to disregard the comment.  See Thrift, 176 S.W.3d at 224. 
As such, we conclude that the trial court's instruction to disregard rendered
Investigator Rodriguez's comment harmless, and the court did not abuse its
discretion in denying Gonzalez's motion for mistrial.  See Ladd, 3
S.W.3d at 567; see also Wead, 129 S.W.3d at 129.  Gonzalez's fourth
issue is overruled.

V. 
Gonzalez's Firearms Expert

 

            By his fifth issue, Gonzalez argues that the
trial court denied him effective assistance of counsel and his due process
rights when it "effectively denied" him the indigent funds and
sufficient time necessary to retain the services of a firearms expert. 
Gonzalez contends, in particular, that the trial court "repeatedly
stonewalled" his attempts to secure a firearms expert.  We disagree that
Gonzalez was denied access to his own expert.  

The Texas Court of Criminal Appeals has
held that if an indigent defendant "requests an expert who can buttress a
viable defense, due process is implicated when the trial court refuses the
request."  Taylor v. State, 939 S.W.2d 148, 152 (Tex. Crim. App.
1996) (en banc); see Ake v. Oklahoma, 470 U.S. 68, 76 (1985); see
also U.S. Const. amend XIV. 
The relevant inquiry regarding whether a defendant is constitutionally entitled
to an expert is whether the expert can provide assistance that is "likely
to be a significant factor" at trial.  Taylor, 939 S.W.2d at 152
(citing Rey v. State, 897 S.W.2d 333, 339 (Tex. Crim. App. 1995) (en
banc)) (other citations omitted).

In January 2006, Gonzalez filed two
motions with the trial court for the appointment of an expert.  In those
motions, Gonzalez alleged that "there are a number of detailed and
technical issues" related to ballistics and firearms which are
"likely to be a significant factor at trial"; for that reason,
Gonzalez argued that the "assistance of a ballistic[s] expert is necessary
so that [he] may have the basic tools to present his defense . . . ." 
After a hearing on January 26, 2006, the trial court granted Gonzalez's
motion.  Over the next three months, counsel for Gonzalez appeared before the
trial court five times presenting various problems with obtaining his expert,
including fee payment arrangements and the logistics of transporting the
firearms, casings, and bullet fragments to the expert in Dallas, Texas.  At
each appearance, the trial court expressed concerns over what it characterized
as delays in bringing the case to trial.[5] 
But at each appearance, the trial court granted Gonzalez's requests for
additional time and resources.  It appears that Gonzalez was unable, before
trial commenced, to obtain a report from his expert or arrange for his expert
to testify.

Having viewed the entire record, we
cannot conclude that the trial court "effectively denied" Gonzalez
access to his requested expert.  It is clear from the record that, in balancing
Gonzalez's interests with the State's limited resources, the trial court made
provisions for Gonzalez to have the resources he was entitled to under the
law.  See Rey, 897 S.W.2d at 337 (identifying judicial economy as one
factor for the trial court to weigh in determining whether to grant an indigent
defendant's request for an expert).  Moreover, aside from a cursory mention
that an expert was needed to counter the testimony of the State's firearms
expert, Gonzalez has not explained to this Court how the appointment of an
expert would have been a significant factor at trial.  See Taylor, 939
S.W.2d at 152.  In sum, our review of the record revealed that the trial court
granted Gonzalez's request; we are not persuaded that Gonzalez's constitutional
rights were violated by his inability to effectively marshal the services of
the expert before trial.  Gonzalez's fifth issue is overruled.

VI. 
Law-of-the-Parties Jury Charge

 

            By
his sixth issue, Gonzalez argues that there was error in the law-of-the-parties
application paragraph of the capital murder jury charge.  Specifically,
Gonzalez argues that the jury was erroneously instructed in that paragraph
regarding the requisite culpable mental state for retaliation, the alleged
aggravating crime that elevated the crime from murder to capital murder in this
case.

            The jury was charged on capital murder, in
relevant part, as follows:

            Our law
provides that a person commits the offense of Murder when the person
intentionally or knowingly causes the death of an individual.

 

            A person
commits the offense of Capital Murder when such person intentionally commits
the murder in the course of committing or attempting to commit the offense of
Retaliation.

 

2.

 

            Our law
provides that a person commits an offense if he intentionally or knowingly
threatens to harm another by an unlawful act in retaliation for or on account
of the service of a person who has reported the occurrence of a crime.

 

. . . .

 

5.

 

            All
persons are parties to an offense who are guilty of acting together in the
commission of an offense.  A person is criminally responsible as a party to an
offense if the offense is committed by his own conduct, by the conduct of
another for which he is criminally responsible, or by both.

 

            A person
is criminally responsible for an offense committed by the conduct of another
if, acting with intent to promote or assist the commission of the offense he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense.  Mere presence alone will not constitute one a party to an
offense.

 

6.

 

Now,
if you find from the evidence beyond a reasonable doubt that on or about JULY
10, 2004, . . . [Gonzalez] did then and there intentionally cause the death of
. . . [Leos] by shooting the victim with a firearm and [Gonzalez] was then and
there in the course of committing or attempting to commit the offense of
retaliation against [Leos];

 

OR

 

            If you
find from the evidence beyond a reasonable doubt that on or about JULY 10,
2004, . . . [Miran] did then and there intentionally cause the death of . . . [Leos]
by shooting the victim with a firearm and [Miran or an unknown person] was then
and there in the course of committing or attempting to commit the offense of
retaliation against [Leos], and that . . . [Gonzalez] then and there knew of
the intent, if any, of [Miran or the unknown person] to shoot and kill [Leos],
and [Gonzalez] acted with intent to promote or assist the commission of the
offense by [Miran or the unknown person] by encouraging, directing, aiding, or
attempting to aid [Miran or the unknown person] to commit the offense of
causing the death of [Leos] . . . , then you will find [Gonzalez] guilty of the
offense of Capital Murder.

 

            . . . .

 

7.

 

            To
warrant a conviction of [Gonzalez] of the offense of Capital Murder, you must
find from the evidence beyond a reasonable doubt not only that . . . [Gonzalez]
or Co-Defendant was engaged in the commission or attempted commission of the
retaliation . . . , if any, but also that [Gonzalez] or Co-Defendant . . . shot
[Leos with the intention of thereby killing him.  Unless you find from the
evidence beyond a reasonable doubt that [Gonzalez] or Co-Defendant . . .
specifically intended to kill . . . [Leos] when he shot him, you cannot convict
him of the offense of Capital Murder.[[6]]

 

Gonzalez contends that the second paragraph under section
6 of the jury charge—the law-of-the-parties application paragraph—allowed the
jury to convict Gonzalez of capital murder without finding that he intended to
assist in Miran or the unknown third man's commission of retaliation.  In other
words, Gonzalez contends that the jury could have convicted Gonzalez of capital
murder if it believed that Gonzalez only intended to assist Miran or the
unknown third man in causing Leos's death.

            In analyzing a jury charge issue, our initial
inquiry is whether error exists in the charge submitted to the jury.  Ngo v.
State, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc).  If error is
found, the degree of harm necessary for reversal depends on whether the
appellant preserved the error by objection.  Id.  If the defendant
properly objected to the erroneous jury charge, reversal is required if we find
"some harm" to the defendant's rights.  Id.  Here, Gonzalez
concedes that he did not object at trial to the jury charge issue he raises on
appeal, so we may only reverse if the record shows egregious harm.  See id.
at 743-44.  To determine whether a defendant suffered egregious harm, we assess
the degree of harm in light of (1) the entire jury charge, (2) the state of the
evidence, including contested issues, (3) the arguments of counsel, and (4) any
other relevant information in the record.  Warner v. State, 245 S.W.3d
458, 461 (Tex. Crim. App. 2008); see Almanza v. State, 686 S.W.2d 157,
172 (Tex. Crim. App. 1985) (op. on reh'g).  Errors that result in egregious
harm are those that affect "the very basis of the case," "deprive
the defendant of a valuable right," or "vitally affect a defensive
theory."  Ngo, 175 S.W.3d at 750; see Hutch v. State,
922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (en banc) (citing Almanza,
686 S.W.2d at 172).

Assuming without deciding that the jury charge
erroneously instructed the jury that it could convict Gonzalez as a party
without finding that he intended to both assist in causing the death and the
retaliation, we still conclude that Gonzalez was not egregiously harmed by the
error.  As discussed previously, the evidence was sufficient to prove either
that Gonzalez was the primary actor or participated as a party in the capital
murder of Leos.  "Where the evidence clearly supports a defendant's guilt
as a principal actor, any error of the trial court in charging on the law of
parties is harmless."  Black v. State, 723 S.W.2d 674, 675 (Tex.
Crim. App. 1986) (en banc) (citing Brown v. State, 716 S.W.2d 939,
945–46 (Tex. Crim. App. 1986) (en banc)) (other citations omitted).  Here, the
evidence was such that the jury could have found that Gonzalez was the shooter
and that he killed Leos in retaliation for the arrest of La Bota.  Any
supposition by us that the jury convicted Gonzalez under the law-of-the-parties
paragraph would be entirely speculative.  Thus, Gonzalez has not shown that he
suffered any harm from the error in the jury charge, much less the sort of harm
that affected the very basis of his case, deprived him of a valuable right, or
vitally affected a defensive theory.  See Ngo, 175 S.W.3d at 750;
Hutch, 922 S.W.2d at 171.  Gonzalez's sixth issue is overruled.

VII.  Conclusion

            Having
overruled all of Gonzalez's issues, we affirm the trial court's judgment.

            

                                                                                                             NELDA
V. RODRIGUEZ

                                                                                                             Justice

 

Do not publish.

Tex.
R. App. P.
47.2(b).

 

Delivered and filed
the   

7th day of July, 2011.

                                                                                                                                                            









[1]
Gonzalez was also indicted for murder, see Tex. Penal Code Ann. § 19.02(b)(1) (West 2003), but the State
dismissed that count after the jury convicted Gonzalez of capital murder.





[2]
This was the second trial of Gonzalez's case.  The first, in November 2005,
ended in a mistrial.





[3]
The evidence established that a total of eight firearms were recovered during
the course of the investigation.  The evidence also showed that three firearms
were recovered from the motel where Gonzalez was arrested.





[4]
It was established that three firearms were ultimately recovered from the motel
room.





[5]
For instance, at a March 23, 2006 appearance where the trial court approved
Gonzalez's request to pay the expert up-front, the court noted that she had
granted Gonzalez's motion "[a] long time ago" and commented,
"I'm not sure I'm going to wait for that report to come back.  It's
incumbent upon you all to do that."  At a March 30, 2006 appearance where
Gonzalez informed the trial court that the expert was requesting an additional
$5000 to travel down to pick up the evidence, the court stated, "I will
confer [about the best way to transport the evidence to the expert], but I'm
not willing to spend a lot of money on these experts."  At three hearings
in April 2006 at which Gonzalez and the trial court were attempting to resolve
the problems with transporting the evidence to Dallas for testing, the court
commented that it was "incumbent on [Gonzalez] to move this process
forward" and expressed that she would call the case to trial if Gonzalez
did not "move on this thing [i.e., obtaining the expert report and testimony]."





[6]
As noted by the State, the jury charge for capital murder does not appear in
the clerk's record on appeal.  Gonzalez does not challenge this circumstance. 
We have drawn our quotation of the relevant portions of the jury charge from
the trial court's recitation of the charge in the reporter's record.